**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

KAILA D. STRINGER,

      Plaintiff,

      v.                         Case No.:  6:24-cv-01224-LHP

WHITE CAP SUPPLY HOLDINGS,
LLC,

      Defendant,

---

## ORDER[1]

On July 3, 2024, Plaintiff Kaila D. Stringer filed a complaint against her former employer, Defendant White Cap Supply Holdings, LLC, alleging claims under the Americans with Disabilities Act ("ADA") and the Family Medical Leave Act ("FMLA"), along with a Florida common law claim for tortious interference with an advantageous business relationship.  Doc. No. 1.  Now before the Court is Defendant's Motion for Summary Judgment.  Doc. No. 36; *see also* Doc. No. 35. Plaintiff has filed a response in opposition, and Defendant a reply.  Doc. Nos. 43, 46.  For the reasons discussed below, the motion (Doc. No. 36) will be granted.

## I.    LEGAL STANDARD.

A court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

[1] The parties consented to the undersigned's jurisdiction.  Doc. Nos. 21-23.

-1-

judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "bears the initial burden of identifying for the district court those portions of the record 'which it believes demonstrate the absence of a genuine issue of material fact.'" *Cohen v. United Am. Bank of Cent. Fla.*, 83 F.3d 1347, 1349 (11th Cir. 1996) (quoting *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1396 (11th Cir. 1994)*, modified on other grounds*, 30 F.3d 1347 (11th Cir. 1994)). Once the movant carries its initial burden, the non-movant may avoid summary judgment by demonstrating an issue of material fact. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993) (citation omitted). The non-movant must provide more than a "mere 'scintilla' of evidence" supporting its position, and "there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986)). In this analysis, the Court is only required to consider the materials cited by the parties, but it may consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

"A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *United States v. Four Parcels of Real Prop. in Green & Tuscaloosa Ctys.* 941 F.2d 1428, 1437 (11th Cir. 1991) (quoting *Anderson*, 477 U.S. at 248). When analyzing a motion for summary judgment, a court draws all reasonable inferences from the evidence in the light most favorable to the non-movant and resolves all reasonable doubt in the nonmovant's favor. *See*

*Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Lubetsky v. Applied Card Sys., Inc.*, 296 F.3d 1301, 1304 (11th Cir. 2002)).  In addition, the court does not make credibility determinations when ruling on a motion for summary judgment.  *See Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (citing *Anderson*, 477 U.S. at 255).  However, "[the] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the nonmovant relies, are 'implausible.'"  *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (citation omitted).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## II.    UNDISPUTED MATERIAL FACTS.[2]

The following facts are taken from record evidence submitted by both parties and are viewed in the light most favorable to Plaintiff.

### A.    *Plaintiff's Employment.*

In August 2017, Plaintiff began working for Valencia College ("Valencia") as a contractor.  Valencia hired Plaintiff as a permanent employee in 2018, and in

---

[2] Pinpoint citations to all filings and exhibits, other than deposition transcripts, are to CM/ECF pagination.  Because the deposition transcripts (Doc. Nos. 35-2, 35-3, 35-4, 35-5) are condensed versions, the Court cites to the deposition page.

March 2020, Plaintiff became a full-time remote worker for Valencia in the role of Project Manager, IT.  *See* Doc. No. 1 ¶ 20; *see also* Doc. No. 35-22; Doc. No. 35-2, at 38, 100, 134.

In December 2020, Plaintiff also began working as a contractor for Defendant, and in June 2021, Defendant hired Plaintiff as a permanent, full-time employee for the position of IT Project Manager.  Doc. No. 1 ¶ 21, Doc. No. 35-2, at 37, 52-57; Doc. No. 35-6.  The parties dispute the meaning of "full-time" and whether Plaintiff had set hours while working for Defendant; her June 9, 2021 offer letter merely states "full-time" without explanation (Doc. No. 35-6), and while several of Defendant's witnesses testified that the "typical" work hours were 8 a.m. to 5 p.m., (*see, e.g.,* Doc. No. 35-3, at 36; Doc. No. 35-4, at 19;  Doc. No. 35-5, at 39; *see also* Doc. No. 35-1 ¶ 3), Plaintiff testified that she was able to work whatever hours were necessary in order to complete assigned projects on time.  *See* Doc. No. 35-2, at 53-57,  134, 163-166.  *But see* Doc. No. 35-22.  What is not in dispute, however, is that Plaintiff continued to work both full-time positions until her termination, and that she never informed Defendant that she was working full-time for Valencia.  Doc. No. 35-2, at 99, 111, 133-35; Doc. No. 35-22.

Plaintiff's employment with Defendant was not perfect.  She received a 2021 performance evaluation that noted "needs improvement" and Plaintiff's "challenges" in several areas.  Doc. No. 46-1.  She was placed on a performance

-4-

improvement plan ("PIP") by one of her former supervisors, Rhonda Lanier, in early 2022, which Plaintiff successfully completed on or about May 13, 2022.  Doc. No. 35-2, at 81-84; Doc. No. 35-25; Doc. No. 35-26; Doc. No. 43-1; Doc. No. 46-2.[3]  At the time Plaintiff completed her PIP, her then supervisor, Suzan Abdurrahman, noted that Defendant expected continued improvement from Plaintiff in the areas of "attendance, communication, conflict resolution skills, and interpersonal soft skills," and that while Plaintiff demonstrated improvement, there was "still work on your end to successfully demonstrate you are a [project manager] who is requested by various leaders."  Doc. No. 43-1.   Plaintiff also was the subject of various counselings from her supervisors in 2023, which are discussed in more detail below.

        B.     *Plaintiff's Requests for FMLA Leave.*

Plaintiff suffers from anxiety and depression, and while employed by Defendant she made several requests for FMLA leave.  Doc. No. 35-2, at 67-71, 98-

---

[3] At various points in time during her employment with Defendant, Plaintiff reported to Rhonda Lanier, Project Management Office ("PMO") Manager; Fran Moncrief, Program Manager; Suzan Abdurrahman, PMO Director; and Sherri Brown, Program Manager.  Doc. No. 35-2, at 51, 57-59; Doc. No. 35-4, at 14; Doc. No. 35-26, at 1.

110.    Those requests were handled by Defendant's third-party administrator – Lincoln Financial Group ("Lincoln Financial").[4] *Id.* at 26-28; Doc. No. 35-9.

Plaintiff first inquired about FMLA leave in May 2022, and Alyssa White, then a Senior HR Generalist for Defendant,[5] directed Plaintiff to contact Lincoln Financial.  Doc. No. 35-9, at 2.  Plaintiff did so, and on June 24, 2022, Lincoln Financial approved Plaintiff's request for short-term disability leave.  Doc. No. 35-2, at 98-101; Doc. No. 35-7.  Although Plaintiff submitted medical records to Lincoln Financial to support this request, she did not provide copies of those records to White or anyone else in HR.  Doc. No. 35-9, at 2.

A few days prior to Plaintiff's August 8, 2022 return to work, Plaintiff contacted White about intermittent FMLA leave, and White advised Plaintiff to contact Lincoln Financial.  Doc. No. 35-8; Doc. No. 35-9, at 2.  Plaintiff thereafter made a request for intermittent FMLA leave, which Lincoln Financial initially denied on or about September 13, 2022.  Doc. No. 35-9, at 19-20.  Plaintiff resubmitted her request, which Lincoln Financial ultimately approved on November 8, 2022 for the period October 24, 2022 through October 23, 2023.  Doc. No. 35-11; *see also* Doc. No. 35-9, at 3.  Plaintiff was approved for unscheduled leave

---

[4] At some point, MetLife became Defendant's third-party administrator for FMLA leave claims, but the precise date is not material to resolving Defendant's motion. *See, e.g.*, Doc. No. 35-2, at 105, 118-19; Doc. No. 35-12.

[5] White is now Defendant's HR Manager.  Doc. No. 35-9, at 1.

of "1 day per episode 1 episode per month and 6 appointments per month."  Doc. No. 35-11.  Plaintiff had submitted additional medical records to support this FMLA leave request, but again did not provide copies of these records to White or anyone else in HR.  Doc. No. 35-9, at 3.

Plaintiff contends that she received "pushback" from her supervisor and HR regarding her use of intermittent FMLA leave, in that on one occasion she was told that she was not approved for FMLA leave although she ultimately took said leave, that Defendant's Senior HR Manager Maggie Herman and others accused Plaintiff of abusing her FMLA leave and using it do other things, and of not really being sick, and that when she occasionally asked to take more FMLA leave then what had been approved, those requests were denied.  Doc. No. 35-2, at 95-98, 102-12.  It is undisputed, however, that Defendant did not deny any of the FMLA leave requests for which Plaintiff had been approved.  *See, e.g.*, Doc. No. 35-2, at 108-9; Doc. No. 35-12.

Plaintiff also testified that starting in February 2023, her supervisors and Herman began reprimanding her for behavior that she had engaged in for years without issue, to include Plaintiff's ability to complete projects on time, and her involvement in a group chat with other project managers.  Doc. No. 35-2, at 90-95. Plaintiff also points to a delay in access to a project manager "toolkit" in early 2023. *Id.* at 166-168.  Plaintiff believes that these reprimands and toolkit delay were in

retaliation for her taking FMLA leave, however, other than Plaintiff's own testimony, and with the exception of Plaintiff's termination discussed below, there is no evidence that Plaintiff was ever subjected to any adverse employment action or denied any FMLA leave or other benefits related to her FMLA requests and leave.

### C.    *Plaintiff's Request for ADA Accommodations.*

During the time that Plaintiff was requesting and taking FMLA leave, she also started to discuss a possible ADA accommodation.  Doc. No. 35-9, at 3-4.  Such requests are handled by Defendant's HR department.  *Id.* at 1, 3-4, 18-23.  By email dated September 13, 2022, White informed Plaintiff that she and her doctor would be required to complete Reasonable Accommodation Paperwork, and to return the completed forms to White.  Doc. No. 35-9 at 19-20.  White followed up on this paperwork by emails dated October 4, 2022 and October 10, 2022, but there is nothing in the record establishing that Plaintiff ever completed the paperwork.  *Id.* at 18-23.  Instead, Plaintiff suggested White simply reference the medical records Plaintiff provided to Lincoln Financial for her FMLA requests, but from the records White could access, there was no mention of any accommodations or work restrictions.  *Id.* at 20-23.

Nothing further happened until March 2, 2023, when Plaintiff contacted White and asked to initiate an ADA interactive process.  Doc. No. 35-13, at 13; Doc. No. 35-9, at 3.  White requested that Plaintiff's medical provider complete an ADA

-8-

Medical Certification Form.  Doc. No. 35-13, at 13-16; Doc. No. 35-9, at 3-4.  On March 15, 2023, Plaintiff submitted the form to White, however Plaintiff filled out the form herself and directed White to reference her short-term disability and/or FMLA paperwork for more information.  Doc. No. 35-13 at 10-12; Doc. No. 35-14. White informed Plaintiff that same day that the self-completed form was insufficient, and that it must be completed by Plaintiff's medical provider, however Plaintiff again directed White to Plaintiff's short-term disability and/or FMLA paperwork instead.  Doc. No. 35-13, at 10-12.

Following additional email communications between Plaintiff and White, on March 16, 2023, Plaintiff provided White with cropped screenshots of medical records that she had previously submitted to Lincoln Financial in June and October 2022.  Doc. No. 35-9, at 4; Doc. No. 35-13, at 9; Doc. No. 35-15.  In a series of emails between March 20-23, 2023, White explained to Plaintiff the steps for the ADA interactive process; that the cropped screenshots were insufficient to support Plaintiff's ADA accommodation request; that because Plaintiff's diagnosed disability was "nonvisible," Defendant could request documentation from a certified medical provider to show that the requested accommodation was needed to perform the essential duties of Plaintiff's job; that the medical records previously provided were out of date and therefore more recent records (1-2 months old) were required; and that Plaintiff could either submit an ADA Medical Certification Form

-9-

completed by her medical provider, or submit current paperwork from her medical provider confirming whether any conditions have changed (for better or worse). Doc. No. 35-13, at 2-9.

On March 31, 2023, Plaintiff provided to White a letter from Jennifer Cynthia Dasque, APRN, of Advent Health Medical Group Family Medicine that requested four (4) accommodations: (1) that Plaintiff be off camera for meetings intermittently upon request; (2) that all scheduled appointments be set for 9:00 am or later; (3) that Plaintiff be provided frequent 10-15 minute breaks every 2 hours from her personal computer, while still available via e-mail/chat/phone; and (4) that Plaintiff not work more than 40 hours per week.  Doc. No. 35-9, at 4-5; *see also* Doc. No. 35-16. On April 17, 2023, Defendant approved all four (4) requests in full for a period of six (6) months.  Doc. No. 35-17.  *See also* Doc. No. 35-13, at 1; Doc. No. 35-9, at 5.[6]

D.    *Plaintiff's Termination.*

At some point in April 2023, Herman became aware that Plaintiff may have a second full-time job; specifically, Herman learned that Plaintiff's name was listed as an IT project manager on Valencia's website.  Doc. No. 35-5, at 35-36; Doc. No. 35-20.    The circumstances surrounding how Herman became privy to this

---

[6] Plaintiff states that she was informally granted similar accommodations for years prior, but provides no record evidence to support this claim.  Doc. No. 43, at 19.

information are unclear, although it is not common practice for Defendant to conduct online searches of their employees.  Doc. No. 35-5, at 35-36.

On April 13, 2023, Herman emailed Valencia's HR department to determine whether Plaintiff was also working for Valencia full-time.  Doc. No. 35-20, at 6. Herman disclosed in this email that Plaintiff was also currently employed with Defendant and had been for almost two (2) years.  *Id.*  The emails make no mention of Plaintiff's FMLA or ADA status.  *Id.* at 1-6.

At some point between April 13-20, 2023, Herman spoke with someone in Valencia's HR department and confirmed that Plaintiff was actively working full-time for Valencia.  Doc. No. 35-20; Doc. No. 35-5, at 36-45.  And through a series of phone calls and emails from April 20-21, 2023 between Herman and Lauren Kelly, Valencia's Director of Employee Relations, Herman provided information to Valencia as to whether Plaintiff was working for Defendant on certain dates in 2022 and 2023, and Kelly confirmed whether Plaintiff was working for Valenica between June 6, 2022 and August 8, 2022.  Doc. No. 35-20, at 1-2.  Herman testified at her deposition that she never discussed with anyone at Valencia Plaintiff's FMLA leave or ADA accommodations, and the emails make no mention of Plaintiff's FMLA or ADA status.  Doc. No. 35-5, at 36, 56; Doc. No. 35-20.  Plaintiff, however, believes that Herman informed two Valencia employees about Plaintiff's ADA accommodations and told them that Plaintiff was abusing her FMLA leave to

-11-

maintain both jobs, and that Herman acted with the intent to defame Plaintiff and to cause Plaintiff to be fired.  Doc. No. 35-2, at 149-151, 158.  Plaintiff further testified that Herman could have confirmed Plaintiff's employment without speaking to anyone at Valencia.  *Id.* at 41.  But other than Plaintiff's testimony, she provides no evidence to support these beliefs.[7]

On or about April 18, 2023, Herman informed Randy Fox, Defendant's Chief Information Officer who oversees Defendant's entire IT department, that Plaintiff was working a second full-time job at Valencia.  Doc. No. 35-1 ¶¶ 1-2, 4.  Herman confirmed to Fox that Plaintiff's work hours at Valenica conflicted with her work hours for Defendant, and that Plaintiff had been working for Valencia the entire time she was employed by Defendant.  *Id.* ¶ 4.  Based on this information, including that Plaintiff had never asked permission to work for Valencia nor disclosed the existence of her job at Valencia to Defendant, Fox made the decision to terminate Plaintiff's employment on April 18, 2023, and she was terminated effective April 19, 2023.  *Id.* ¶¶ 4-6; Doc. No. 35-21.  The decision to fire Plaintiff was made only one (1) day after Plaintiff was informed that her ADA accommodation request had been approved.  Doc. No. 35-1 ¶ 6; Doc. No. 35-13, at 1; Doc. No. 35-9, at 5.

---

[7] Plaintiff alleges in her complaint that Valencia and Defendant have a procedure where they use a third-party for employment verification, but has provided no evidence to support this assertion.  Doc. No. 1 ¶ 39.

E.      *Defendant's Outside Employment Policy.*

In Fox's Declaration, submitted in support of Defendant's summary judgment motion, Fox states he made the decision to terminate Plaintiff's employment "solely because she violated the Outside Employment Policy," which had been in effect for the entirety of Plaintiff's employment with Defendant.  Doc. No. 35-1 ¶ 7.

Defendant has submitted two near identical copies of its "Outside Employment Policy and Procedure" ("OEPP"), one dated January 2021, the other January 2022.  Doc. Nos. 35-18, 35-24.  Defendant's OEPP does not prohibit employees from working more than one job.  Rather, the OEPP clearly prohibits employees from engaging in outside employment that would interfere with the employees' ability to perform their job duties.  The OEPP also prohibits changing any work assignments or schedules to accommodate outside employment, and prohibits employees from using work hours to conduct business related to the outside employment.  In particular, the OEPP provides that if an employee is on a leave of absence for medical or personal reasons, the employee "may not accept outside employment if to do so is inconsistent with the reason(s) for the leave."[8] Doc. No. 35-18, at 2; Doc. No. 35-24, at 2.  Citing to Defendant's Code of Business

---

[8] Plaintiff admitted at her deposition that she would at times work for Valencia while she was on FLMA leave with Defendant.  Doc. No. 35-2, at 99, 111-12.

Conduct & Ethics, the OEPP further states that there can be no conflict of interest between the employee's work for Defendant and the outside employment, and defines a conflict of interest as "when an associate's personal interests affect, or appear to affect, an associate's support of White Cap or judgment associated with any White Cap-related duties."  Doc. No. 35-18, at 1-2; Doc. No. 35-24, at 1-2.

While Defendant contends that the OEPP has been in effect throughout Plaintiff's employment and that Plaintiff previously acknowledged receipt of the OEPP (*see, e.g.*, Doc. No. 35-9, at 5-6), Plaintiff testified that she never reviewed the OEPP, never agreed to comply with the OEPP, and that the OEPP was in fact created only after her termination.  Doc. No. 35-2, at 129-33, 185-86.  While the question of the existence of the OEPP is largely undisputed, the question of whether Plaintiff was aware of and consented to it remains at issue.[9]

---

[9] Plaintiff incorrectly states that White and Herman testified that the OEPP did not exist until after Plaintiff's termination.  Doc. No. 43, at 7.  To the contrary, both White and Herman testified that the OEPP was in full effect during Plaintiff's employment.  Doc. No. 35-3, at 14-15, 35-36, 44-47; Doc. No. 35-9, at 5; Doc. No. 35-5, at 54-55.  The only other evidence Plaintiff points to is her own testimony, which relies on hearsay statements from unspecified other persons, and the testimony of her former supervisor, Sherri Brown.  Doc. No. 35-2, at 129-33; *see also* Doc. No. 35-4, at 13-14, 40-41.  But Brown's testimony is inconsistent, at one point she testified that she was not aware of any dual employment policy until an email from Randy Fox was distributed, while on the other hand, she testified that she recalls taking dual employment training.  Doc. No. 35-4, at 13-14, 40-41.  And Plaintiff has not submitted a copy of the Fox email either.  *See Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("For factual issues to be considered genuine, they must have a real basis in the record[;] . . . mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." (citations omitted)).

Defendant states that the OEPP is part of its Code of Ethics, that every full-time employee must complete onboarding training at the start of their employment, which includes compliance training as well as review of the Code of Ethics, and that Plaintiff completed this training on July 7, 2021 and again on May 17, 2022. Doc. No. 35-9, at 5-6. To support this assertion, Defendant has provided a copy of a computer printout listing various digital courses that Plaintiff completed, but for July 7, 2021 it shows Plaintiff completing a "Company Policy Affirmation" digital course, and there is no mention of a Code of Ethics or OEPP, and for May 17, 2022, the printout shows that Plaintiff completed an "Ethics and Code of Conduct" digital course, but again there is no mention of the OEPP. Doc. No. 35-9, at 27.[10] Defendant has also submitted a "true and correct copy"" of a two-page "Policy Affirmation Requirements" form that Defendant contends Plaintiff electronically signed, but this copy is not filled out, nor is it signed or dated by Plaintiff. Doc. No. 35-9, at 5-6, 29-30; *see also* Doc. No. 35-19. In other words, these documents do not support Defendant's assertions. Therefore, in order to state that Plaintiff was or was not aware of the OEPP prior to her termination, the Court would have to make a credibility assessment, which is a task left to the jury. And given that the Court

---

[10] Defendant has not submitted a complete copy of either the Company Policy Affirmation or the Ethics and Code of Conduct course.

must take all factual inferences in the light most favorable to the Plaintiff, the Court will assume for purposes of this Order that Plaintiff was not aware of the OEPP.

What is undisputed, however, is that at the time Fox made his decision to fire Plaintiff, he did not know whether Plaintiff had a disability, was not aware of any requests for ADA accommodations, and was not aware of any FMLA leave requests or leave usage.  Doc. No. 35-1 ¶¶ 8-10.  Fox was not involved in handling or approving accommodation or leave requests, and to the best of his knowledge he never had a one-on-one conversation with Plaintiff.  *Id.* ¶ 11.

Following Valencia's discussion with Herman, Valencia conducted its own investigation, and on May 12, 2023, Valencia terminated Plaintiff's employment on the basis of Plaintiff's employment with Defendant, her failure to disclose same to Valencia, and various inconsistent statements Plaintiff made during Valencia's investigation.  Doc. No. 35-22.

## III.   DISCUSSION.

Plaintiff has asserted four (4) claims against Defendant: a claim for failure to provide reasonable accommodations as well as disability discrimination in violation of the ADA (Count I); retaliation in violation of the ADA and in violation of the FMLA (Counts II and III); and a claim for tortious interference with Plaintiff's business relationship with Valencia (Count IV).  Defendant seeks summary judgment as to all four (4) claims.

-16-

A.     *Failure to Accommodate (Count I).*

To establish a *prima facie* ADA discrimination claim, Plaintiff must show that (1) she is disabled; (2) she is a qualified individual; and (3) she was subjected to unlawful discrimination because of her disability. *Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 754 (11th Cir. 2023). "Under the ADA, unlawful discrimination includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability' unless doing so 'would impose an undue hardship' on the employer." *Id.* (quoting 42 U.S.C. § 12112(b)(5)(A)).

In her complaint, Plaintiff references two different accommodation requests: one made on an unspecified date in September 2022, and the other made on March 15, 2023. Doc. No. 1 ¶¶ 24, 29. *See also* Doc. No. 35-9, at 18-23.[11] As to the September 2022 request, Defendant argues that Plaintiff's claim is time-barred, as Plaintiff dual-filed her charge of discrimination with the Georgia Commission on Equal Opportunity and the EEOC on October 3, 2023, and Plaintiff's charge only discusses disability discrimination related to her March 2023 request for accommodations. Doc. No. 36, at 11; *see also* Doc. No. 35-23. Plaintiff does not address this argument

---

[11] In her response, Plaintiff for the first time also mentions an "August 2022" time period. Doc. No. 43, at 19. Plaintiff points to no record evidence to support this date, and in any event, an August 2022 request for accommodation would still be time-barred.

in her response, therefore it would appear that this claim has been abandoned.  *See* Doc. No. 43; *see also Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014)[12] (When "a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned." (citation and internal quotation marks omitted)).[13]

The Court agrees with Defendant.  "To file a claim for employment discrimination under the ADA, the plaintiff must first exhaust his administrative remedies, beginning by filing a charge of discrimination with the EEOC."  *Coley v. Shaw Indus.*, No. 21-10545, 2021 WL 4429818, at *1 (11th Cir. Sept. 27, 2021) (citing *Maynard v. Pneumatic Prods. Corp.*, 256 F.3d 1259, 1262 (11th Cir. 2001) and 42 U.S.C. § 12117(a) (incorporating the enforcement provisions of 42 U.S.C. § 2000-5)). Ordinarily, a charge of discrimination must be filed with the EEOC within 180 days of the allegedly unlawful employment practice, but the period for filing a charge with the EEOC may be extended to 300 days if the complainant first files a timely charge in a state or local agency in a "deferral state." *Maynard*, 256 F.3d at 1262-63

---

[12] Unpublished opinions of the Eleventh Circuit are cited as persuasive authority. *See* 11th Cir. R. 36–2.

[13] Defendant also argues that Plaintiff never actually made a request for an ADA accommodation in September 2022, Doc. No. 36, at 10-11, but the Court need not reach that issue given that Plaintiff never exhausted her administrative remedies in any event. *See also D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1022 (11th Cir. 2020) (The employer's "duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made by an employee." (citation and quotation marks omitted)).

(citing 42 U.S.C. § 2000e–5(e)(1) (1994)).  The burden of proving compliance with these time provisions rests with the plaintiff.  *Id.* at 1262.

Here, Plaintiff never filed any charge in Florida, which is a deferral state; rather she dual-filed her charge in Georgia, which is not a deferral state, therefore the 180-day period applies.  *See Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1258 (11th Cir. 2003) (explaining that "[b]ecause Georgia is a non-deferral state, [the plaintiff] was required to file a Charge of Discrimination within 180 days of the alleged unlawful employment action." (citation omitted)); *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001) (explaining that for an EEOC charge of discrimination to be timely in a non-deferral state such as Georgia, it must be filed within 180 days of the last discriminatory act).  Plaintiff did not file her charge until October 3, 2023, thus, any request for accommodations Plaintiff made in September 2022 is time-barred, and Defendant is entitled to summary judgment.  *See, e.g., Garry v. Walgreen Co.*, No. 1:12-cv-139 WLS, 2013 WL 3449196, at *2 (M.D. Ga. July 9, 2013) ("Plaintiff's failure to file her EEOC charge within the 180–day period, coupled with her failure to allege any equitable exceptions, dictate that her [Title VII and ADA] claims be dismissed as time barred." (citations omitted)); *Henderson v. Salvation Army*, No. 1:20-cv-05144-SEG-JCF, 2022 WL 22329131, at *9 (N.D. Ga. July 12, 2022), *report and recommendation adopted*, No. 1:20-cv-5144-SEG-JCF, 2022 WL 22329145 (N.D. Ga. Aug. 8, 2022) (granting summary judgment on Title VII and ADA claims

-19-

as time-barred where plaintiff filed EEOC charge two days after the expiration of the 180-day period).[14]

Turning to Plaintiff's March 15, 2023 accommodation request, Defendant contends that it is entitled to summary judgment because Defendant granted Plaintiff's request in full on April 17, 2023.  Doc. No. 36, at 11-13; *see also* Doc. No. 35-13, at 1; Doc. No. 35-9, at 4-5.  Plaintiff concedes that her requests were ultimately approved, *see* Doc. No. 43, at 5-6, 20; Doc. No. 35-2, at 126-27, but argues that Defendant's delay in approval and requests for additional paperwork constitute a "constructive denial" of Plaintiff's requested accommodation and a violation of the ADA.  *See* Doc. No. 43, at 10, 19-20.   Plaintiff also appears to argue that Defendant did not engage in the interactive process.   *Id.* at 2, 13, 20-21; *see also* 29 C.F.R.

---

[14] Defendant cites only to the 300-day time period that applies in deferral states. Doc. No. 36, at 11.  Even if Defendant were correct, Plaintiff's October 3, 2023 charge would still fall outside the longer 300-day limitations period with respect to any accommodation requests made in September 2022, rendering her claim time barred.  *See Serian v. JetBlue Airways Corp.*, No. 6:23-cv-2471-JSS-LHP, 2025 WL 1685258, at *3 (M.D. Fla. June 16, 2025), *aff'd*, No. 25-12433, 2026 WL 752755 (11th Cir. Mar. 17, 2026) (granting summary judgment on ADA failure to accommodate claim where plaintiff did not file a charge within 300 days of the date that the employer denied the request for accommodation).  And to the extent Plaintiff argues in her response that her March 2023 request somehow revived her September 2022 request, thereby restarting the time clock, "'any subsequent request for the same accommodation does not, and cannot, restart the statute of limitations period.'"  *Id.* (quoting *Campbell v. Boies, Schiller, Flexner LLP*, 543 F. Supp. 3d 1334, 1344 (S.D. Fla. 2021)).

§ 1630.2(o)(3) (permitting an interactive process to determine reasonableness of an accommodation).[15]

Upon review, the Court again agrees with Defendant. Taking the undisputed facts in the light most favorable to Plaintiff, it is clear that Defendant initiated the interactive process in March 2023, that Defendant repeatedly requested medical documentation from Plaintiff, who refused to comply until March 31, 2023, and that once the documentation was provided, Defendant granted Plaintiff's requests – in full – a mere 17 days later. Plaintiff provides no legal authority suggesting that this brief delay in granting her requested accommodations, particularly where Plaintiff initially refused to provide the necessary medical documentation to support her request, constitutes a violation of the ADA,[16] and no reasonable jury would find that Defendant violated the ADA under these undisputed facts.

---

[15] Plaintiff states that on April 17, 2023 she "disputed inaccuracies in the ADA approval letter and noted the lack of an interactive process" and was terminated two days later. Doc. No. 43, at 2. The record cites that Plaintiff references to support this statement either do not exist (Doc. No. 35-3, at 57:19-58:11; Doc. No. 35-5, at 72:15-74:2), or do not establish that Plaintiff engaged in any such conduct. Doc. No. 35-17. In addition, Plaintiff cites to *Nadler v. Harvey*, No. 06-12692, 2007 WL 2404705, at *9 (11th Cir. Aug. 24, 2007) to support her argument that Defendant did not maintain an interactive process and therefore must be held liable. Doc. No. 43, at 2. But *Nadler* addresses the question of whether the *McDonnell Douglas* burden shifting analysis applies to claims for reasonable accommodation, and the word "interactive" is nowhere mentioned in that case. And the Court is at a loss as to why Plaintiff cites to *Kolstad v. American Dental Association*, 527 U.S. 526, 536 (1999), (Doc. No. 43, at 21), which addresses whether punitive damages are available under Title VII.

[16] Plaintiff cites to *Stewart v. Happy Herman's Cheshire Bridge Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997) and *Todd v. Fayette County School District*, 998 F.3d 1203, 1214 (11th Cir.

The Court will therefore grant summary judgment in favor of Defendant as to Plaintiff's failure to accommodate claim. *See, e.g., Palmer v. McDonald*, No. 8:13-cv-01784-T-02JSS, 2019 WL 1490667, at *10-12 (M.D. Fla. Apr. 4, 2019), *aff'd*, 824 F. App'x 967 (11th Cir. 2020) (granting summary judgment on ADA accommodation claim and finding two-month delay in approval of accommodation not unreasonable, where delay "is at least in part attributable to Plaintiff's failure to promptly provide medical documentation"); *Russell v. City of Tampa*, No. 8:14-cv-814-T-17AEP, 2015 WL 5871189, at *4 (M.D. Fla. Oct. 5, 2015), *aff'd*, 652 F. App'x 765 (11th Cir. 2016) ("This Court cannot find a 28–day delay in the granting of an accommodation as unreasonable under the ADA. Employers must be given an opportunity to process requests for accommodation and institute appropriate remedial measures."); *Harrison v. Fulton Cnty., Ga.*, No. 1:13-cv-03553-ODE-WEJ, 2016 WL 10536024, at *20 n.37 (N.D. Ga. Oct. 31, 2016), *report and recommendation adopted*, No. 1:13-cv-3553-ODE-WEJ, 2017 WL 5382141 (N.D. Ga. Jan. 18, 2017), *aff'd*, 735 F. App'x 579 (11th Cir. 2018) (An "employer's unreasonable delays in identifying and implementing reasonable accommodations can constitute a lack of good faith for purposes of the interactive process, and can serve as evidence of an

---

2021) to support her contention that a delay in granting a requested accommodation violates the ADA. Doc. No. 43 at 10, 20. However, neither case even suggests such a legal doctrine, but rather involve situations where an employer provided accommodations (*Stewart*), or provided a legitimate non-discriminatory reason for terminating the plaintiff's employment (*Todd*).

-22-

ADA violation.  However, the record shows no unreasonable delays here.  Once plaintiff requested accommodation, the County moved quickly by requesting information from his doctor.  Although the process took two months, half of that delay was caused by plaintiff's doctor.  In any event, even if the County had been responsible for the entire two-month delay, plaintiff could not complain, as other courts have excused much longer delays." (citations and internal quotation marks omitted)).  *See also D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1022 (11th Cir. 2020) ("Under the ADA, an employer will not be liable for failure to accommodate if the employee is responsible for the breakdown of the interactive process." (citation omitted)); 29 C.F.R. Pt. 1630, App. ("When the need for an accommodation is not obvious, an employer, before providing a reasonable accommodation, may require that the individual with a disability provide documentation of the need for accommodation.").

> B.      *Disparate Treatment Discrimination (Count I).*

Plaintiff also alleges she was terminated due to her disability, in violation of the ADA.  Doc. No. 1 ¶ 58.  "The ADA prohibits an employer from discriminating against a 'qualified individual on the basis of disability.'"  *McCarroll v. Somerby of Mobile, LLC*, 595 F. App'x 897, 899 (11th Cir. 2014) (quoting 42 U.S.C. § 12112(a)).  A plaintiff may prove disparate treatment discrimination by providing direct evidence of discrimination, that is, evidence that "if believed, proves the existence

-23-

of a fact without inference or presumption" and includes "[o]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor." *Todd v. Fayette County Sch. Dist.*, 998 F.3d 1203, 1215 (11th Cir. 2021) (citations omitted).  In the absence of direct evidence, a plaintiff may provide circumstantial evidence of discrimination pursuant to the *McDonnell Douglas* burden-shifting framework.  *Akridge v. Alfa Ins. Cos.*, 93 F.4th 1181, 1191 (11th Cir. 2024); *Todd*, 998 F.3d at 1215–16.

In her response, Plaintiff contends that the record contains both direct and circumstantial evidence of discrimination.  Doc. No. 43, at 2.  However, Plaintiff does not point to any direct evidence; rather, Plaintiff cites to the temporal proximity between Plaintiff's requested accommodation and her termination, the delay in approving her ADA accommodations, that other employees of Defendant were able to engage in outside employment without repercussions, that Defendant's reason for terminating Plaintiff shifted, and that Plaintiff was not aware of nor agreed to the OEPP as proof of Defendant's discriminatory animus.[17]

---

[17] At other points, Plaintiff references facts that simply do not exist in the record. For example, Plaintiff claims that "Valencia officials confirmed their decision relied on [Defendant's] false claims," and that "Herman misrepresented to Valencia College that Plaintiff was required to work only 9:00 a.m. to 5:00 p.m. as an ADA accommodation." Doc. No. 43, at 4, 21.  But Plaintiff submitted no evidence to support these assertions, the email chain between Herman and Valencia nowhere mentions any ADA accommodations or work schedule, and Valencia's Notice of Dismissal discusses Plaintiff's own admissions on several of these points.  *See* Doc. No. 35-20; Doc. No. 35-22.

Doc No. 43, at 4, 9-12, 19-20.  But none of these facts rise to the level of direct evidence as they are susceptible to differing interpretations, and therefore require inferences and presumptions to support a finding of discrimination.  *See Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) ("[D]irect evidence . . . [is] evidence, which if believed, proves [the] existence of [a] fact in issue without inference or presumption.  Evidence that only suggests discrimination, or that is subject to more than one interpretation, does not constitute direct evidence." (citations and internal quotation marks omitted).  Accordingly, the Court will evaluate Plaintiff's ADA claim based on circumstantial evidence.  *Redish v. Blair*, No. 5:14-cv-260-Oc-22PRL, 2016 WL 890083, at *3 (M.D. Fla. Mar. 9, 2016) ("Plaintiff argues that she was terminated because of her condition. Plaintiff has offered evidence regarding the facts surrounding her EEOC charge and argued against the validity of the Operations Directive. Neither show discriminatory intent without having to draw further inferences . . . .  Therefore, the evidence currently before the Court is circumstantial."); *see also Zwick v. Univ. of S. Fla. Bd. of Trs.*, 505 F. Supp. 3d 1317, 1336 (M.D. Fla. 2020) (applying circumstantial evidence analysis where plaintiff  complained "of no flagrantly discriminatory remark . . . that, if believed, would constitute direct evidence of discrimination.").

Under the *McDonnell Douglas* burden shifting framework, an ADA plaintiff establishes a *prima facie* case of disability discrimination by showing that (1) she has

-25-

a disability; (2) that she is a qualified individual under the ADA; and (3) that her employer discriminated against her on the basis of her disability. *Akridge*, 93 F.4th at 1191-92 (citing *Beasley v. O'Reilly Auto Parts*, 69 F. 4th 744, 754 (11th Cir. 2023) and 42 U.S.C. § 12112(a)).  If the plaintiff establishes her *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the decision. *Id.* at 1191  The burden then shifts back to the plaintiff "to present sufficient evidence creating a genuine issue of material fact that the employer's reason is pretext for discrimination." *Id.* (citation omitted).

Defendant does not challenge the first two prongs of Plaintiff's *prima facie* case, rather, Defendant argues that the undisputed material facts do not establish that Plaintiff was terminated because of her disability. *See Akridge*, 93 F.4th at 1192 (To prove that discrimination occurred "because of" a plaintiff's disability, plaintiff must show that the adverse employment action would not have occurred "but for" plaintiff's disability).  Specifically, Defendant points to the fact that Randy Fox, the sole decisionmaker as to Plaintiff's termination, had no knowledge of Plaintiff's disability, and that Plaintiff has failed to identify any similarly situated comparator. Doc. No. 36, at 14-19.

"[A]n employee cannot be fired 'because of' a disability unless the decisionmaker has actual knowledge of the disability." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1185 (11th Cir. 2005).  Defendant has submitted undisputed evidence in

-26-

the form of Fox's declaration, in which he avers that at the time he made the decision to terminate Plaintiff's employment he had no knowledge of Plaintiff's disability or her requested accommodations. Doc. No. 35-1. And the Court cannot impute Herman's knowledge on to Fox. *See Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001) (finding reversible error where district court imputed knowledge of supervisor onto the decision-making Board, because "[d]iscrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent").

In response, Plaintiff points to the timing of her termination – two days after she was notified that her accommodation request had been granted – and the issues of fact surrounding whether Plaintiff was aware of and agreed to the OEPP policy. Doc. No. 43, at 19-22. However, "an employee cannot be fired because of a disability unless the decisionmaker has actual knowledge of the disability." *Payne v. Goodyear Tire & Rubber Co.*, 760 Fed. Appx. 803, 809–10 (11th Cir. 2019) (citations omitted). Taking these issues of fact in the light most favorable to Plaintiff, it remains undisputed that Fox was not aware of Plaintiff's disability at the time she was terminated, and in the absence of such knowledge, Plaintiff cannot establish that Fox made the decision to terminate her because of her disability, and therefore she

-27-

cannot establish her *prima facie* case.[18]   *See, e.g., Sanichara v. GEICO Gen. Ins. Co.*, No. 8:24-cv-2635-VMC-AAS, 2026 WL 113612, at *7 (M.D. Fla. Jan. 15, 2026) (absent evidence that decisionmakers had actual knowledge of the disabilities, plaintiff cannot establish a *prima facie* case); *Campbell v. Boies, Schiller, Flexner LLP*, 543 F. Supp. 3d 1334, 1342 (S.D. Fla. 2021) (granting summary judgment on ADA claim for discriminatory termination where defendant adduced evidence that the decisionmaker who terminated plaintiff did not have actual knowledge of her disability, plaintiff failed to cite to any evidence in the record in rebuttal, and the court refused to impute knowledge possessed by others onto the decisionmaker); *Pecora v. ADP, LLC*, 232 F. Supp. 3d 1213, 1219 (M.D. Fla. 2017) ("Under the causation analysis explicated by the Eleventh Circuit, the employer's agent who makes the termination decision must have actual knowledge of the employee's disability in order for the employee to establish that the disability was a causal factor in the employer's action.  Even when the employee's direct supervisor has knowledge of information indicating that an employee suffers from a disability, that

---

[18] Plaintiff continues to argue that the OEPP did not exist until after her firing, but even if Plaintiff were able to at least create an issue of fact on this point, it would not aid her cause. *See Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) ("Put frankly, employers are free to fire their employees for 'a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" (quoting *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984))).

information will not be imputed to the employer when the supervisor is not the one making the termination decision." (citing *Cordoba*, 419 F.3d at 1174-75)).[19]

Plaintiff also argues that she can establish her *prima facie* case via the cat's paw theory of causation.   Doc. No. 43, at 4, 14-16.  "The cat's paw theory provides that discriminatory animus may be imputed to a neutral decision-maker if a supervisor recommends an adverse employment action due to a discriminatory animus and that recommendation is a motivating factor of the decision-maker's ultimate adverse employment action."  *Quintero v. Publix Super Markets, Inc.*, No. 18-cv-21615, 2020 WL 607117, at *2 (S.D. Fla. Feb. 7, 2020) (citing *Staub v. Proctor Hospital*, 562 U.S. 411, 422 (2011)).  *See also Harrison v. Belk, Inc.*, No. 17-14839, 2018 WL 4211587, at *4 (11th Cir. Sept. 5, 2018) ("Under a 'cat's paw' theory, liability may be established if the plaintiff shows that the decisionmaker merely 'followed the biased recommendation [of a non-decisionmaker] without independently investigating the complaint against the employee.'" (citation omitted) (alteration in original)).

-----

[19] Plaintiff cites to *Connelly v. WellStar Health Sys., Inc.*, 758 F. App'x 825, 829 (11th Cir. 2019) and *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001) for the proposition that "knowledge and causation may be inferred from timing and context." Doc. No. 43, at 21-22.  But neither of these cases stand for this proposition.  Rather, in *Connelly*, the Eleventh Circuit addressed pretext, and found that the plaintiff failed to allege any specific evidence that would permit a reasonable factfinder to conclude that her former employer's proffered legitimate, non-discriminatory reason for her termination was pretextual.  *See Connelly*, 758 F. App'x, at 829-31.  And *Silvera* states the exact opposite conclusion.  *See Silvera*, 244 F.3d at 1262 ("Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent.").  *See also Howard v. Steris Corp.*, 550 F. App'x 748, 751 (11th Cir. 2013) ("Howard argues that the decision makers had *constructive* notice of his sleep disorder.  This argument fails[.]" (emphasis in original)).

-29-

Plaintiff contends that the record evidence shows (or at least creates genuine issues of fact) that Herman possessed a discriminatory animus towards Plaintiff, and that Fox relied entirely on Herman's actions in deciding to terminate Plaintiff. Doc. No. 43, at 14-16.

Even assuming that Plaintiff has sufficiently created a fact issue that Herman possessed a disability-based discriminatory animus towards Plaintiff, the problem with Plaintiff's argument – as Defendant points out in its reply – is that in order for the cat's paw theory to apply, Plaintiff must point to record evidence demonstrating that Herman made some sort of recommendation to Fox that he rubber stamped, or that Herman's conduct had a "determinative influence" on Fox's decision to terminate Plaintiff. *See* Doc. No. 46, at 4. And on this point, Plaintiff fails.

The evidence before the Court is undisputed; Herman reported accurately to Fox that Plaintiff was working full time for Valencia while also working full time for Defendant. And there is nothing in the record even suggesting that Herman made any sort of recommendation to Fox, or that Herman was otherwise involved in the decision to terminate Plaintiff. Herman simply reported the facts, and Fox made a decision based upon his own evaluation of those facts. As such, Plaintiff's cat's paw theory fails. *See, e.g., Joyce v. Sewon C&A Inc.*, No. 2:21-cv-355-WKW, 2022 WL 6766144, at *6-7 (M.D. Ala. Oct. 11, 2022) (rejecting cat's paw theory of causation where the allegedly biased subordinate employee "never recommended a course of

-30-

action and rather sent complaints of misconduct up the chain of command"); *Lewis v. Kendall*, No. 5:18-cv-263-TKW-MJF, 2022 WL 19408074, at *4-5 (N.D. Fla. Dec. 12, 2022) (rejecting cat's paw theory "because it is undisputed that Davis merely reported the Plaintiff's misconduct and did not make any recommendation of adverse action to the unknowing decisionmaker."); *Brooks v. Hyundai Motor Mfg. Ala., LLC*, No. 2:09-cv-384-WKW, 2010 WL 3614168, at *10 (M.D. Ala. Sept. 8, 2010), *aff'd*, 444 F. App'x 385 (11th Cir. 2011) (rejecting cat's paw theory where the allegedly biased employee did not make any recommendation that the plaintiff be fired, but only truthfully and accurately notified superiors that plaintiff left work early). *Cf. Godwin v. WellStar Health Sys., Inc.*, 615 F. App'x 518, 528-530 (11th Cir. 2015) (denying summary judgment where record created genuine issues of material fact that non-decisionmaker who recommended plaintiff's termination was biased against plaintiff due to her age, and where decisionmaker testified that he would not have terminated plaintiff without the recommendation).

Plaintiff places great emphasis on the fact that Fox did not conduct an independent investigation of the information Herman reported, merely "rubber stamping" Herman's actions. Doc. No. 43, at 14-16. However, as Fox stated in his declaration, he reviewed the information Herman provided, and he alone made the decision to terminate Plaintiff, based on his determination that Plaintiff violated the OEPP. Doc. No. 35-1. *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1270 (11th

-31-

Cir.2001) (where a decisionmaker conducts her own evaluation and makes an independent decision, her decision is "free of the taint of a biased subordinate employee"); *Hodge v. Orlando Utilities Comm'n*, No. 6:09-cv-1059-Orl-19, 2011 WL 250400, at *10 (M.D. Fla. Jan. 26, 2011) ("[A]n independent investigation does not necessarily require independent verification of the facts underlying the allegedly biased recommendation, so long as an independent analysis of those facts is conducted."). Moreover, Plaintiff cites no legal authority mandating that an independent investigation take place in order to avoid application of the cat's paw theory. Rather, it is but one factor to consider, and here, where it is undisputed that Herman made no recommendations to Fox and played no role in the decision to terminate Plaintiff's employment, the information provided to Fox was accurate, and Fox reached his own conclusion to terminate Plaintiff, no reasonable factfinder would conclude that Plaintiff's disability was the "but-for" cause of her termination.[20] *See Dwyer v. Ethan Allen Retail, Inc.*, 325 F. App'x 755, 758 (11th Cir.

---

[20] Plaintiff cites to *Blash v. City of Hawkinsville*, 856 F. App'x 259, 263 (11th Cir. 2021) and *Rudy v. Walter Coke, Inc.*, 613 F. App'x 828, 832 (11th Cir. 2015) to support her cat's paw theory. Doc. No. 43, at 14. Not only are Plaintiff's pinpoint citations to both cases incorrect (for example there is no page 832 in *Rudy*), but neither decision supports Plaintiff's argument. *Blash* involved a biased supervisor who recommended plaintiff's termination, and there was record evidence that the biased supervisor was directly involved in the termination decision. *Blash*, 856 F. App'x at 265-66. And the Eleventh Circuit in *Rudy* affirmed summary judgment where there was nothing in the record beyond plaintiff's own speculation that the decisionmaker was aware of plaintiff's medical condition, and the undisputed evidence showed that the allegedly biased supervisor "was uninvolved with the termination process beyond reporting the complaint" – nearly the precise situation here. *Rudy*, 613 F. App'x at 831.

2009) (evidence that the allegedly biased subordinate "made no recommendation to [the decision-maker] about the course of action to take on [the plaintiff]" was an additional fact weighing against a cat's paw theory of liability).

Plaintiff next argues that she can establish her ADA discrimination claim by pointing to a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination.  Doc. No. 43, at 9, 13, 19-21.  *See Ismael v. Roundtree*, 161 F.4th 752, 761 (11th Cir. 2025) ("[A] plaintiff who cannot establish the *McDonnell Douglas* prima facie case is entitled to a full review under the convincing mosaic standard.").  "A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements. . ., and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual."  *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (citation omitted).  The convincing mosaic approach "is not more forgiving than the [*McDonnell Douglas* framework] on the final question, which is whether a reasonable jury could infer illegal discrimination."  *McCreight v. AuburnBank*, 117 F.4th 1322, 1335 (11th Cir. 2024).  And as relevant here, "the inference to be drawn by a jury must be that the employee's disability was a but-for cause of the employer's intentional discrimination."  *Akridge*, 93 F.4th at

-33-

1197.   Even under the convincing mosaic standard, Plaintiff cannot survive summary judgment.

Plaintiff points to the delays in receiving her requested accommodations, the fact that she was terminated two days after her accommodations were approved, that other employees maintained outside employment without repercussions, and that the OEPP did not exist until after Plaintiff's termination.[21]  Doc. No. 43, at 13, 19-22.  However, the Court has already held that the short delay in approving Plaintiff's accommodation was reasonable and the product of Plaintiff's own unwillingness to participate in the interactive process, thus the delays also do not suggest that Plaintiff was terminated due to her disability.[22]

Nor has Plaintiff pointed to any similarly situated comparator that engaged in similar conduct and was not disciplined.  "A fellow employee is 'similarly situated' when they: (1) 'have engaged in the same basic conduct (or misconduct)

---

[21] Plaintiff also claims that Defendant gave shifting explanations for her termination, Doc. No. 43, at 4, 20, but provides no record evidence for this assertion.  To the contrary, the records Plaintiff references show that the sole reason provided for Plaintiff's termination was her violation of the OEPP.  *See* Doc. No. 35-1 ¶ 7; Doc. No. 35-5, at 35, 44-45; Doc. No. 35-3, at 35.

[22] Plaintiff also appears to argue that Defendant bypassed its own policies by not interviewing Plaintiff prior to terminating her employment, by not verifying her work hours through a review of Plaintiff's FMLA and ADA paperwork, and that Plaintiff's direct supervisor should have fired her, not Fox.  Doc. No. 43, at 15-17.  But once again, Plaintiff has provided no evidence suggesting that any such internal policies existed, and Plaintiff cites no legal authority suggesting that a failure to take such steps can infer intentional disability discrimination.

as the plaintiff'; (2) 'have been subject to the same employment policy, guideline, or rule as the plaintiff'; (3) 'have been under the jurisdiction of the same supervisor'; and (4) 'share the plaintiff's employment or disciplinary history.'" *Wilkie v. Outokumpu Stainless USA, LLC*, No. 24-14109, 2025 WL 3079343, at *1 (11th Cir. Nov. 4, 2025) (quoting *Lewis v. City of Union City*, 918 F.3d 1213, 1227–28 (11th Cir. 2019)). Plaintiff identifies in her response two potential comparators, Brown and Herman (Doc. No. 43, at 3, 23), but neither are sufficient. Brown was Plaintiff's supervisor, and thus was not similarly situated to Plaintiff, and she testified that her second job did not conflict with her work with Defendant as it was seasonal and only on weekends and evenings. Doc. No. 35-4, at 10-13. *See also Crawford v. City of Tampa*, No. 8:08-cv-927-T-26TBM, 2009 WL 3586619, at *6 (M.D. Fla. Oct. 28, 2009), *aff'd*, 397 F. App'x 621 (11th Cir. 2010) (supervisor of plaintiff is not similarly situated and therefore cannot be viewed as a comparator).

And Herman, who at the time was Defendant's Senior HR Manager, clearly held different job duties from Plaintiff, there is no evidence that she was under the same chain of command as Plaintiff, and most importantly, Herman testified that she never held a second job while working for Defendant. *See* Doc. No. 35-5, at 8-17, 56-57. This testimony is uncontradicted by anything other than Plaintiff's own

-35-

speculation.[23]    *See also Akridge*, 93 F.4th at 1198 (rejecting convincing mosaic argument in part because plaintiff's proffered comparators had different job duties); *Guinand-Dao v. Baptist Health of S. Fla., Inc.*, No. 19-24233-CIV, 2021 WL 783824, at *9 (S.D. Fla. Mar. 1, 2021) (granting summary judgment on age and disability discrimination claims where plaintiff "failed to present evidence of any other employee who conducted herself in a similar manner under similar conditions yet remained employed.").

This leaves the temporal proximity between when Plaintiff requested and received her ADA accommodations and her termination, and the factual disputes regarding Defendant's distribution of the OEPP.  But taking these facts in the most favorable light to Plaintiff, they are not enough to raise a genuine dispute about whether the reason for her termination was disability discrimination.  As discussed above, there is no evidence that Fox had any knowledge of Plaintiff's disability or accommodation requests, and "temporal proximity by itself generally cannot prove that an employer's proffered reasons are pretextual."  *Todd*, 998 F.3d at 1219.  *See*

---

[23] Plaintiff testified that she saw Herman's LinkedIn profile and an HR consulting website (Doc. No. 35-2, at 137-38), but did not produce copies of same, nor anything else that would render this uncorroborated testimony anything other than inadmissible hearsay. *See MSP Recovery Claims, Series LLC v. Am. Nat'l Prop. & Cas. Co.*, 550 F. Supp. 3d 1311, 1319 (S.D. Fla. 2021) (unauthenticated screenshots and printouts of websites are inadmissible hearsay and cannot be considered at summary judgment).  In addition, Plaintiff mentions three other employees who she contends are potential comparators – Sarah Porter, and someone named "Terocko" and another named "Ana."  Doc. No. 35-2, at 134-36.  But other than this brief reference, Plaintiff provides no evidence to establish that these individuals could be comparators.

*also Sanichara*, 2026 WL 113612, at *8 ("While Ms. Sanichara was terminated a few weeks after requesting leave from Ms. Holmer, this closeness in time is insufficient by itself to suggest that the real reason for her termination was discrimination given the decisionmakers' lack of knowledge." (citing *Rudy v. Walter Coke, Inc.*, 613 F. App'x 828, 830 (11th Cir. 2015))).  And whether the OEPP policy actually existed and/or Plaintiff was aware of it does not create a genuine issue of material fact given that there still remains an absence of evidence sufficient for a reasonable factfinder to infer that the "but-for" reason for Plaintiff's termination was her disability. *See Wilkie*, 2025 WL 3079343, at *2 ("To show pretext, the employee must confront the employer's seemingly legitimate reason . . . 'head on and rebut it.'  It is not enough for the plaintiff to 'simply quarrel[ ] with the wisdom of that reason.'" (citations omitted) (alterations in original)); *Akridge*, 93 F.4th at 1198 (plaintiff did not establish convincing mosaic of disability discrimination where there was no genuine factual dispute that the decisionmakers who terminated plaintiff did not have knowledge of plaintiff's medical issues, and thus plaintiff failed to present evidence that the reasons for her firing were pretextual).  In other words, "an employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Akridge*, 93 F.4th at 1195 (citation and internal quotation marks omitted). *See also Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015)

("[The Court is] not a 'super-personnel department' assessing the prudence of routine employment decisions, 'no matter how medieval,' 'high-handed,' or 'mistaken.'" (quoting *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010))).[24]

In sum, the undisputed evidence shows that Fox had no knowledge of Plaintiff's disability or requested accommodations, Plaintiff held two full-time jobs at the same time and did not notify Defendant or seek permission to do so, no evidence was submitted suggesting that Defendant harbored any hostility towards employees with disabilities,  and Plaintiff has not identified any comparators that engaged in similar conduct but were not disciplined or terminated.  And while the timing of Plaintiff's termination certainly raises an eyebrow, without more, no reasonable jury could find that the reason for Plaintiff's termination was disability discrimination.  *See Sanichara*, 2026 WL 113612, at *7-10 (granting summary judgment and rejecting convincing mosaic argument on ADA discrimination claim

---

[24] For these same reasons, Plaintiff's claim that the "honest belief" rule does not apply (Doc. No. 43, at 3, 16-18)  fails, as there is no evidence that Defendant inconsistently applied the OEPP, and Plaintiff has admitted that she was simultaneously working two full-time jobs, and did not notify or seek approval from Defendant. *See Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989) (Admission of misconduct provides sufficient foundation for an employer's good faith belief that an employee has engaged in misconduct).  The Court is unsure why Plaintiff cites to *Howard v. Hyundai Motor Manufacturing Alabama,* 754 F. App'x 798, 805-07 (11th Cir. 2018), as this case affirmed the grant of summary judgment where the plaintiff failed to put forth any similarly situated comparators.  Doc. No. 43, at 16.

for similar reasons); *Akridge*, 93 F.4th at 1197-98 (affirming entry of summary judgment on ADA disparate treatment claim for similar reasons).

Summary judgment will be granted as to the ADA discrimination claim.

C.      *ADA and FMLA Retaliation Claims (Counts II-III).*

Plaintiff has also asserted two claims for retaliation, one under the ADA (Count II), and the other under the FMLA (Count III).[25]   The elements of Plaintiff's *prima facie* case are the same for both claims.  *See Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016) ("To prevail on her ADA retaliation claim, Plaintiff must show that: (1) she engaged in a statutorily protected expression, (2) she suffered an adverse employment action, and (3) there was a causal link between the two."); *Jarvela v. Crete Carrier Corp.*, 776 F.3d 822, 832 (11th Cir. 2015) (To establish a *prima facie* case of retaliation under the FMLA, "an employee must show that, (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment decision, and (3) the decision was causally related to the protected activity.") (citation and internal quotation marks omitted).   Requesting a reasonable accommodation and/or requesting FMLA leave constitute statutorily protected

---

[25] Throughout her response, Plaintiff also appears to argue that Defendant interfered with her FMLA rights.  *See, e.g.*, Doc. No. 43, at 3, 5, 7, 10-11.  But Plaintiff did not allege a claim of FMLA interference in her complaint (Doc. No. 1), and cannot do so now.  *Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1338 (11th Cir. 2024) ("[A] plaintiff[ ] may not raise new claims at the summary judgment stage." (citation and internal quotation marks omitted)).

activity. *Frazier-White*, 818 F.3d at 1258 (reasonable accommodation); *Dowler v. GEICO Gen. Ins. Co.*, 554 F. Supp. 3d 1243, 1249 (M.D. Fla. 2021) (requesting FMLA leave). However, to establish the causation element of either an ADA or FMLA retaliation claim "requires a showing of but-for causation." *Frazier-White*, 818 F.3d at 1258 (ADA retaliation); *see also Lapham v. Walgreen Co.*, 88 F.4th 879, 893 (11th Cir. 2023) (FMLA retaliation).

Defendant concedes that Plaintiff engaged in protected activity under both the ADA and FMLA, and that she was subjected to an adverse employment action via her termination. Doc. No. 36, at 20-22. Defendant argues, however, that as with her discrimination claim, Plaintiff cannot establish causation, primarily due to Fox's lack of knowledge that Plaintiff made any ADA accommodation request or asked for/was using FMLA leave. *Id.*

Plaintiff's arguments in response mirror those raised in support of her disparate treatment claim. First, she contends that direct evidence of retaliation exists, but again has failed to point to any. Second, she contends that she has established causation either via the *McDonnell Douglas* framework, the cat's paw theory, or the convincing mosaic analysis[26] because: (1) her termination and her

---

[26] The cat's paw and convincing mosaic frameworks apply equally to retaliation claims. *See, e.g., McCormick v. Se. Pers. Leasing, Inc.*, No. 22-10466, 2022 WL 4462172, at *2 (11th Cir. Sept. 26, 2022) (discussing convincing mosaic argument in ADA and FMLA retaliation case); *Ahern v. Delta Air Lines, Inc.*, 609 F. Supp. 3d 1314, 1339 (S.D. Fla. 2022) (analyzing cat's paw theory in ADA retaliation claim).

requests for accommodation/leave were in close temporal proximity to each other; (2) her requests for a reasonable accommodation were previously delayed and/or denied; (3) Herman began her investigation into Plaintiff's outside employment with Valencia while Plaintiff was proceeding with the ADA interactive process; (4) Plaintiff received "performance" emails and reprimands: (5) Defendant selectively enforced the OEPP and did not discipline or terminate other employees who engaged in outside employment; (6) issues of fact remain as to whether the OEPP existed prior to her termination; (7) Defendant proffered "shifting" explanations for her termination; (8) Defendant bypassed the normal chain of command in investigating Plaintiff's dual employment; and (9) Herman lied to Valencia that Plaintiff was abusing her FMLA leave. Doc. No. 43, at 10-18, 23-24.

The Court has addressed the majority of these arguments in detail above, and they are equally unpersuasive here. Plaintiff has presented no record evidence establishing that her requests for accommodation were delayed or denied; that there were similarly situated comparators treated differently from Plaintiff; that Defendant proffered shifting explanations for Plaintiff's termination and/or bypassed the normal chain of command; and/or that Herman ever told Valencia anything about Plaintiff's ADA or FMLA status. Rather, all Plaintiff has to support these assertions is her own speculation, or the argument of counsel in her

-41-

response.[27]   But neither are sufficient to create a genuine issue of material fact that would survive summary judgment.   *See Ibeh v. Wilson*, No. 23-13128, 2024 WL 2723253, at *1 (11th Cir. May 28, 2024) ("[A]n inference based on speculation and conjecture is not reasonable."  (citation and internal quotation marks omitted)); *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir.2005) ("For factual issues to be considered genuine, they must have a real basis in the record[;] . . . mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." (citations and internal quotation marks omitted)).   *See also*

---

[27] In her complaint and response, Plaintiff also contends that the alleged denial of her requested accommodations on multiple occasions and Herman's alleged disclosure of confidential information to Valencia constitute adverse employment actions.  Doc. No. 1 ¶¶ 74, 88; Doc. No. 43, at 12, 21.  These arguments merit no further discussion given the absence of any record evidence to support them.  Plaintiff further alleges that she suffered additional adverse employment actions in the form of her work being unfairly scrutinized, she was provided false information regarding her FMLA paperwork, denied a project management toolkit, forced to shut down two group chats, reprimanded via email, and accused of abusing her FMLA leave.  Doc. No. 1 ¶¶ 74, 86, 88; Doc. No. 43, at 6.  But none of these additional acts constitute an adverse employment action because Plaintiff has not established that they resulted in any discipline or negative impact on any term or condition of Plaintiff's employment.  *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001) ("[a]n employment action is considered 'adverse' only if it results in some tangible, negative effect on the plaintiff's employment."); *Presley v. Gulf Cnty. Sch. Bd.*, 730 F. Supp. 3d 1218, 1227 (N.D. Fla. 2024), *appeal dismissed*, No. 24-11575-J, 2024 WL 3806003 (11th Cir. June 11, 2024) (a failure to accommodate or failure to engage in the ADA interactive process do not constitute adverse employment actions; rather "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." (citations and internal question marks omitted); *Moore v. Hillsborough Cnty. Bd. of Cnty. Comm'rs*, 544 F. Supp. 2d 1291, 1308 (M.D. Fla. 2008) ("Negative performance evaluations, standing alone, do not constitute adverse employment action sufficient to satisfy the second element of a prima facie case of retaliation under the ADA." (citation and internal quotation marks omitted)).

-42-

*Straley v. Ferrellgas, Inc.*, No. 8:08-cv-2460-T-26MAP, 2009 WL 10670500, at *3 (M.D. Fla. Sept. 16, 2009) ("To the extent that Plaintiff contends Defendant 'knew' she was working off the clock, the record reflects nothing but conclusory statements, personal opinion, and speculation as the basis. This is insufficient as a matter of law.").[28]

As for the timing of Plaintiff's termination, "[t]emporal proximity alone is insufficient to establish a causal connection in the absence of actual knowledge by the employer." *Jarvela*, 776 F.3d at 832. And again, Plaintiff has presented no information even suggesting Fox was aware of Plaintiff's ADA or FMLA status at the time he decided to terminate her employment. Moreover, while Herman, who clearly was aware of Plaintiff's ADA and FMLA requests, was the person who conducted the investigation into Plaintiff's employment with Valencia, Plaintiff has

---

[28] Plaintiff also claims that White testified that Plaintiff was limited to one day per month of FMLA leave, but that no such restriction existed in Plaintiff's medical certification or FMLA regulations. Doc. No. 43, at 10. Not only does Plaintiff fail to cite to White's deposition testimony on this point, but the exhibit Plaintiff does cite to clearly states that Plaintiff was approved for "1 day per episode 1 episode per month and 6 appointments per month." Doc. No. 35-11. Plaintiff also states that Brown testified that Defendant limited her ability to allow Plaintiff's FMLA absences, and that Brown coded Plaintiff's FMLA leave as paid time off. Doc. No. 43, at 11. Again, the deposition citations Plaintiff references contain no such testimony, nor is there any record evidence that Plaintiff's FMLA leave was ever denied. Doc. No. 35-4, at 41-43, 45-49. And Plaintiff also argues that she had no active discipline until after she sought FLMA and ADA accommodations. Doc. No. 43, at 5. Again, Plaintiff cites no record evidence in support, she testified that she was not disciplined for seeking leave and accommodations, (Doc. No. 35-2, at 82-83), and the only discipline she was subjected to was her 2022 PIP, which was completed well before any FMLA or ADA requests were made.

again failed to point to any record evidence that Herman ever informed Fox about Plaintiff's requests, made any recommendations to Fox, that the information provided to Fox was untrue, or that Herman was otherwise involved in the decision to terminate Plaintiff.

Accordingly, Defendant is entitled to summary judgment on Plaintiff's ADA and FMLA retaliation claims.[29]  *See McCormick v. Se. Pers. Leasing, Inc.*, No. 22-10466, 2022 WL 4462172, at *2 (11th Cir. Sept. 26, 2022) (affirming summary judgment on ADA and FMLA retaliation claims where plaintiff did not establish causation because the human resources director involved in plaintiff's FMLA and ADA requests was not involved in the decision to fire her); *Jarvela*, 776 F.3d at 832 (affirming summary judgment on FMLA retaliation claim where vice president who fired plaintiff was unaware that plaintiff had taken FMLA leave, the information the vice president relied upon in terminating plaintiff did not mention the FMLA, and plaintiff, who had the burden of proving actual knowledge of his FMLA leave, failed to do so); *Rudy*, 613 F. App'x at 830 (stating in the context of an FMLA retaliation claim that "[t]emporal proximity alone does not establish a causal connection when there is unrebutted evidence that the decisionmaker was not

---

[29] Plaintiff asserts in her response that she filed retaliation complaints with HR on March 2, 2023 and April 17, 2023.  Doc. No. 43, at 2, 12, 13, 23.  But Plaintiff's record citations on this point either do not exist (Doc. No. 35-5, at 72:12-74-74:2; Doc. No. 35-3 at 57:19-58:11), or they do not support Plaintiff's argument.  Doc. No. 35-17 (letter and email to Plaintiff approving her accommodations in full).

-44-

aware of the protected activity"); *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799-800 (11th Cir. 2000) (affirming summary judgment on FMLA retaliation claim where there was unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct); *see also Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1355-56 (11th Cir. 1999) (finding summary judgment appropriate on Title VII retaliation claim where plaintiff was informed the day after she engaged in protected activity that she was going to be terminated, because plaintiff "failed to present sufficient evidence to establish that [the decision maker] was aware of her protected conduct").

D.     *Tortious Interference (Count IV).*

In her final claim, Plaintiff alleges that Defendant tortiously interfered with her long-standing employment relationship with Valencia when Herman contacted Valencia and reported that Plaintiff was working full-time for Defendant, that Herman intentionally and maliciously informed Valenica that Plaintiff was abusing FMLA and disclosed Plaintiff's ADA medical information to Valencia, and that as a result, Valencia ultimately terminated Plaintiff's employment.  Doc. No. 1 ¶¶ 93-98.

"To prevail on a claim for tortious interference, a plaintiff must prove: 1) the existence of a business relationship that affords the plaintiff legal rights; 2) knowledge of the relationship by the defendant; 3) an intentional and unjustified

-45-

interference with the relationship by the defendant; and 4) damage to the plaintiff resulting from the breach of that relationship." *Z Prods., Inc. v. SNR Prods.*, Inc., No. 8:10-cv-966-T-23MAP, 2011 WL 3754693, at * 8 (M.D. Fla. Aug. 18, 2011), *report and recommendation adopted*, No. 8:10-cv-966-T-23MAP, 2011 WL 3752281 (M.D. Fla. Aug. 25, 2011) (citing *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1995)).

Defendant only challenges the third element, arguing that it did not intentionally or unjustifiably interfere with Plaintiff's employment with Valencia. Doc. No. 36, at 22-25. "[A]n interference is intentional if the person interfering knows of the business relationship with which he is interfering, knows he is interfering with that relationship, and desires to interfere or knows that the interference is substantially certain to occur as a result of his action." *Weight-Rite Golf Corp. v. U.S. Golf Ass'n*, 766 F. Supp. 1104, 1112 (M.D. Fla. 1991) (citation and internal quotations omitted), *aff'd sub nom. Weight-Rite Golf v. U.S. Golf*, 953 F.2d 651 (11th Cir. 1992). A plaintiff "must plead and prove that the defendant manifested a specific intent to interfere with the business relationship." *NoNaNi Ent., LLC v. Live Nation Worldwide, Inc.*, No. 8:22-cv-1829-WFJ-JSS, 2023 WL 1967579, at *3 (M.D. Fla. Feb. 13, 2023) (citations and internal quotation marks omitted). "Proof of the requisite intent is necessary as '[t]here is no such thing as a cause of action for interference which is only negligently or consequentially effected.'" *Maxi–Taxi of*

*Fla., Inc. v. Lee Cnty. Port Auth.*, 301 Fed. Appx. 881, 885–86 (11th Cir.2008) (quoting *Ethyl Corp. v. Balter*, 386 So.2d 1220, 1223–24 (Fla. 3d DCA 1980)) (alterations in original).

Further, "malice is key to the tort of tortious interference with a business relationship." *Ingenuity, Inc. v. Linshell Innovations Ltd.*, No. 6:11-cv-93-Orl-28KRS, 2014 WL 1230695 (M.D. Fla. Mar. 25, 2014), *aff'd*, 644 F. App'x 913 (11th Cir. 2016) (citation and internal quotation marks omitted). "Without direct evidence of malicious intent, malice can only be shown by proving a series of acts which, in their context or in light of the totality of the circumstances, are inconsistent with the premise of a reasonable man pursuing a lawful objective, but rather indicate a plan or course of conduct motivated by spite, ill-will, or other bad motive." *Cherestal v. Sears Roebuck & Co.*, No. 6:12-cv-1681-Orl-28TBS, 2014 WL 644727, at *4 (M.D. Fla. Feb. 19, 2014) (quoting *Rockledge Mall Assocs., Ltd. v. Custom Fences of S. Brevard, Inc.*, 779 So.2d 554, 557 (Fla. 5th DCA 2001)) (internal quotation marks omitted). And if intent is shown, a plaintiff must then establish that the interference was unjustified, which is based on a defendant's conduct, motives, and interests being advanced. *Weight-Rite Golf Corp.*, 766 F. Supp. at 1112 (citing *Smith v. Emery Air Freight Corp.*, 512 So.2d 229, 230 (Fla. 3rd DCA 1987)).

The undisputed record evidence fails to support that Defendant acted with malice or an intent to interfere with Plaintiff's employment with Valencia. Herman

testified that the sole reason for communicating with anyone at Valencia was to confirm Plaintiff's dual employment, Doc. No. 35-5, at 37, and the emails between Herman and Valencia support her testimony. Doc. No. 35-20. There is nothing in the record suggesting that Herman intended to interfere with or damage Plaintiff's employment with Valencia. *See Tardif v. People for Ethical Treatment of Animals*, 829 F. Supp. 2d 1219, 1231 (M.D. Fla. 2011), *on reconsideration in part*, No. 2:09-cv-537-FTM-29, 2011 WL 6004071 (M.D. Fla. Dec. 1, 2011) (granting summary judgment where there was no evidence that would support an inference that defendant disclosed information with an intent to interfere with or damage the employment relationship between plaintiff and his employer). And while Plaintiff repeatedly argues that Herman told Valencia about Plaintiff's ADA and FMLA status, and defamed Plaintiff by telling Valencia that Plaintiff was abusing her FMLA leave, there is simply no evidence to support these contentions; Plaintiff's speculation alone is insufficient. *See, e.g., W.P. Prods., Inc. v. Tramontina USA, Inc.*, No. 18-63162-CIV, 2020 WL 3566400, at *3 (S.D. Fla. June 12, 2020) (granting summary judgment on tortious interference claim where plaintiff attempted "to use rumors, conjecture and inadmissible hearsay to create a genuine dispute"); *Baumgartner v. Papa Johns USA, Inc.*, No. 6:18-cv-658-Orl-37GJK, 2019 WL 7423531, at *4 (M.D. Fla. Oct. 16, 2019) ("But because there is no evidence that Defendant or Billman provided

-48-

negative references to Plaintiff's prospective employers Plaintiff cannot show Defendant tortiously interfered with his business relationships by doing so.").

Nor is there any record evidence to suggest that Defendant acted without justification. "No cause of action for intentional interference exists which is the consequence of a rightful action." *Networkip, LLC v. Spread Enters., Inc.*, 922 So.2d 355, 358 (Fla. 3d DCA 2006). "Additionally, a plaintiff cannot be successful in a tortious interference case if the defendant merely gave a third party truthful information." *Cherestal*, 2014 WL 644727, at *4 (citing *Worldwide Primates, Inc. v. McGreal*, 26 F.3d 1089, 1092 (11th Cir. 1994)). Surely an employer is justified in verifying whether an employee is engaging in conduct that violates a company policy and/or creates a conflict of interest, which is exactly what Herman did. Moreover, it is undisputed that the information Herman provided to Valencia was accurate, and Plaintiff has failed to support her claim that Herman ever mentioned anything about the ADA or FMLA to Valencia.[30]  *See* Doc. No. 35-20. And while Plaintiff claims that Defendant did not go through the proper channels to confirm her dual employment (Doc. No. 43, at 26-27), she once again points to nothing besides her own speculative testimony. Doc. No. 35-2, at 158-59. *See also Westgate*

---

[30] Plaintiff's testimony on this point is also based on inadmissible hearsay. Doc. No. 35-2, at 149-51, 158. In addition, Plaintiff again contends that Herman contacted Valenica one day after Plaintiff filed an internal ADA retaliation complaint specifically naming Herman (Doc. No. 43, at 26), but as before, there is no record evidence to support this claim.

*Resorts, Ltd. v. Sussman*, 387 F. Supp. 3d 1318, 1352-53 (M.D. Fla. 2019) ("The issue is not simply whether the actor is justified in causing the harm, but rather whether he is justified in causing *it in the manner in which he does cause it*." (citation and internal quotation marks omitted) (emphasis in original)).

"Under Florida law, a company's actions are justified when undertaken to protect its own business interests, such as to reduce the risk of loss.  So long as the company does not engage in improper conduct, it may take steps to protect its business interests without liability for tortious interference."  *Romika–USA, Inc. v. HSBC Bank USA, N.A.*, 514 F.Supp.2d 1334, 1339 (S.D.Fla.2007).  This is exactly what happened here, Plaintiff cites no legal authority to the contrary,[31] and no reasonable jury would find for Plaintiff given the undisputed record evidence.[32]  Accordingly,

---

[31] Plaintiff's citation to *McCurdy v. Collis*, 508 So. 2d 380, 384 (Fla. Dist. Ct. App. 1987) is unpersuasive as that case involved facts suggesting malice on the part of the defendant. And Plaintiff's quotation from *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1128 (Fla. 1985) does not appear to exist (*see* Doc. No. 43, at 28), as that case involved the question of vicarious or agency liability in a tortious interference claim.

[32] While not argued by Defendant, the Court also questions whether Plaintiff can establish the causation element of her claim.  Defendant only provided truthful and accurate information to Valencia, and as noted in Valencia's Notice of Dismissal, Plaintiff was terminated due to her violations of Valencia's own policies, as well as the inconsistencies in Plaintiff's own statements to Valencia during their independent investigation.  Doc. Nos. 35-20, 35-22.  *See also Cherestal*, 2014 WL 644727, at *5 (M.D. Fla. Feb. 19, 2014) (granting summary judgment on tortious interference claim where there was no evidence that termination was based on anything other than accurate information, and plaintiff provided no evidence other than her speculative opinion that she was fired for reasons other than violating company policy); *Ingenuity, Inc. v. Linshell Innovations Ltd.*, No. 6:11-cv-93-Orl-28-KRS, 2014 WL 1230695, at *4 (M.D. Fla. Mar. 25, 2014), *aff'd*, 644 F. App'x 913 (11th Cir. 2016) ("The law in Florida is clear [t]hat there is no such thing as a cause of

Defendant is entitled to summary judgment on Plaintiff's tortious interference claim.[33]

## IV.   CONCLUSION.

For the reasons discussed above, Defendant's Motion for Summary Judgment (Doc. No. 36) is **GRANTED** as to all claims.  The Clerk of Court is directed to enter judgment in favor of Defendant and against Plaintiff, terminate any other pending motions, and close the file.  Defendant may proceed with any request for fees and costs a permitted by law, including 28 U.S.C. § 1920, Federal Rule of Civil Procedure 54, and Local Rule 7.01.

A final note.  This Order is unusually lengthy, in large part due to the numerous mischaracterizations of fact and law that permeate Plaintiff's response and which required extensive review by the Court.  While the Court understands a mis-cite or incorrect quote here and there, Plaintiff's response goes far beyond the

---

action for interference [with a contractual or advantageous business relationship] which is only negligently or consequentially effected." (citations and internal quotations omitted) (alterations in original)).

[33] Because Plaintiff has failed to establish her *prima facie* case, the Court need not address Defendant's privilege arguments.  Doc. No. 36, at 24-25.  That said, the Court does note that at least one of Defendant's arguments appears persuasive.  *See Premise Health Holding Corp. v. Thomas*, No. 6:21-cv-2166-WWB-LHP, 2024 WL 6893871, at *3-4 (M.D. Fla. Jan. 22, 2024) (finding statements made by one having an interest or duty therein to another having a corresponding interest in the same statement are protected by a qualified privilege and cannot support a tortious interference claim absent a showing that malice was the sole basis for the interference); *Crestview Hosp. Corp. v. Coastal Anesthesia, P.A.*, 203 So. 3d 978, 981 (Fla. Dist. Ct. App. 2016) (conditional privilege applies to statements made between parties who have a mutual interest in evaluating a person's work).

normal excusable mistakes or carelessness, repeatedly cites to facts and legal theories that do not exist on this record, and appears to rise to the level of a potential violation of Federal Rule of Civil Procedure 11, as well as raises concerns that the response may be a product of the impermissible use of Artificial Intelligence programs. The Court will be issuing a separate order to show cause to Plaintiff's counsel to address this concern.

**DONE** and **ORDERED** in Orlando, Florida on May 14, 2026.

LESLIE HOFFMAN PRICE
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record